| | |
|---|---|
| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| *versus* § | CRIMINAL ACTION NO. 4:16-CR-11 |
| § | |
| JACOB JOSEPH SMITH (5) § | |

## MEMORANDUM AND ORDER

Pending before the court are Defendant Jacob Joseph Smith's ("Smith") Motion to Transfer Supervised Release Jurisdiction (#409) and Letter Motion (#429). In his first motion, Smith requests that the court transfer the jurisdiction of his 4-year term of supervised release from the Eastern District of Texas to the Northern District of Texas. In his second motion, Smith avers that the Federal Bureau of Prisons ("BOP") has incorrectly calculated his male custody classification score ("Classification Score"). Smith requests that the court order the BOP to correct his Classification Score and order his release to home confinement in light of COVID-19. United States Probation and Pretrial Services ("Probation") recommends denying the latter motion. Having considered the motions, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motions should be denied.

I.  Background

Smith is currently serving an 84-month term of imprisonment, which was imposed after he pleaded guilty to Conspiracy to Manufacture or Distribute or Possess with Intent to Manufacture or Distribute Marijuana, in violation of 21 U.S.C. § 846. The Presentence Investigation Report ("PSR") reveals that Smith transported large quantities of marijuana and drug proceeds and also engaged in money laundering as a member of the conspiracy. He was found responsible for the distribution of 4,500 kilograms of marijuana. Smith is currently housed at the

Federal Medical Center ("FMC") Fort Worth, in Fort Worth, Texas.[1] In his Letter Motion, Smith contends that he is eligible for home confinement under the CARES Act of 2020 because he has completed more than 50% of his sentence. Smith avers that the only reason he was denied release to home confinement is because the BOP incorrectly calculated his Classification Score by assessing him "as having 5 violent points over a minor argument that [he] had in 2017."

II.     Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

---

[1] As of June 25, 2020, the figures available at www.bop.gov lists 30 inmates and 0 staff members at FMC Fort Worth as "Confirmed Active Cases" of COVID-19. According to Probation, 579 inmates and 1 staff have recovered from COVID-19 infections, while 10 inmates have succumbed to the disease.

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP); *Slate v. United States*, No. 5:09-CV-00064, 2009 WL 1073640, at *3 (S.D.W.Va. Apr. 21, 2009) ("Absent a motion from the BOP, the Court lacks authority to grant compassionate release."). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, No. 20-1298, 2020 WL 2845694, at *2 (6th Cir. June 2, 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *Alam*, 2020 WL 2845694, at *2; *Raia*, 954 F.3d at 597.

Here, Smith's request to be reviewed for Home Confinement due to COVID-19 was denied on May 15, 2020, because his Prisoner Assessment Tool Targeting Estimated Risk and Needs

("PATTERN") score was above the minimum and he had a history of violence. Thus, Smith appears to have complied with the exhaustion requirement; however, nothing in his motions indicates that extraordinary and compelling reasons exist to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[2] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement

---

[2] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

Here, Smith, age 39, does not contend that extraordinary and compelling reasons exist. Rather, Smith argues that because he has "no history of violence" and has completed more than 50% of his sentence he is entitled to be released to home confinement. Smith's contention is both legally and factually incorrect. While BOP's internal guidelines require that an inmate serve 50% or more of his sentence before considering him for home confinement, the guidelines also require that wardens consider a myriad of other factors. *See* Memorandum to Correctional Program Administrators from David Brewer, Acting Senior Deputy Assistant Director, Furlough and Home Confinement Additional Guidance, available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Home-confinement-additionalguidance.pdf. One of the factors a warden is required to consider is the inmate's history of violence. In Smith's case, Associate Warden Segovia denied his request to be released to home confinement because his PATTERN score was too high and he had a history of violence. Smith maintains that both conclusions are inaccurate.

Smith contends that the reason he was denied release to home confinement is because he has "5 violent points over a minor argument that [he] had in 2017." Probation points out that the 5 points resulted from an incident where Smith was charged with fighting with another inmate. The Disciplinary Hearing Officer's Report indicates that Smith agreed that the report was true and accurate, and Smith did not appeal the disciplinary hearing decision. Moreover, the 5 points were allocated to Smith's Classification Score not his PATTERN score. These are two different scores. The BOP relied on Smith's PATTERN score, not his Classification Score, when denying his

request for home confinement, and Smith has not challenged the computation of his PATTERN score.

Nevertheless, even if Smith's scores were improperly calculated, the BOP acted appropriately when it denied Smith's request. Smith's PSR indicates he was charged with Assault with Intent to Commit Sexual Battery, but the case was dismissed on September 15, 2011. On September 15, 2014, an information was filed on the same case under a different charge, Assault with Intent to Commit a Felony. The arrest affidavit indicates that on December 31, 2007, Smith tried to kiss and inappropriately touch his 16-year-old female cousin. On June 27, 2017, this charge was dismissed because the victim did not wish to cooperate. Although his case was dismissed, Smith's purported behavior toward the victim in the case is concerning, as Probation notes. Moreover, the PSR indicates that Smith was hospitalized in a mental institution at age 14 after he threatened to kill his aunt and wrote her name on a bullet. In addition, Smith has a prior conviction for prostitution in which he engaged in "deviate sexual intercourse and sexual intercourse" for a fee. He also has a history of poly-substance abuse dating from age 6, including drinking jars of "moonshine" every other day and illicitly taking a variety of prescription medications and veterinary drugs until his arrest in 2016. Furthermore, even if Smith could demonstrate that he meets all of the qualifications for home confinement under the BOP guidance, it merely "is an internal BOP policy statement adopted in connection with the discretionary decision making required under 18 U.S.C. § 3582(c)(1)(A) and provides guidance for wardens in making these discretionary decisions." *See Cannon v. United States*, CR 11-048-CG-M, 2019 WL 5580233, at *1 (S.D. Ala. Oct. 29, 2019). The policy does not bind the BOP or the court, nor does it bestow any rights upon Smith. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*,

442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.").

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement.[3] *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes

---

[3] As of June 25, 2020, the BOP has responded to COVID-19 by placing 4,465 inmates on home confinement.

that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020)). Smith's track record is similarly a poor one. In this situation, compassionate release is not warranted in light of the applicable factors set forth in 18 U.S.C. § 3553(a). In addition, the court cannot conclude that Smith would not pose a danger to the safety of any other person or to the community, if released from confinement.

In short, Smith has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See Koons*, 2020 WL 1940570, at *4-5 (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Id.*

B.     Supervised Release—Transfer of Jurisdiction

"A court, after imposing a sentence, may transfer jurisdiction over a probationer or person on supervised release to the district court for any other district to which the person is required to proceed as a condition of his probation or release, or is permitted to proceed, *with the concurrence of such court*." 18 U.S.C. § 3605 (emphasis added). When, as here, a defendant requests that the court transfer jurisdiction over his supervised release prior to his release from incarceration, courts routinely deny the request as premature. *See United States v. Houston*, No. 3:93CR746, 2013 WL 5308878, at *2 (N.D. Ohio Sept. 19, 2013); *United States v. Siegel*, No. 1:08-CR-84-JGM-01, 2013 WL 1819682, at *1 (D. Vt. Apr. 30, 2013); *United States v. Fuller*, 211 F. Supp. 2d 204, 206 (D. Me. 2002); *accord United States v. Pittman*, 915 F.3d 1005, 1008 (5th Cir. 2019) (finding that the district court's denial of an incarcerated defendant's motion to transfer supervised release jurisdiction as premature was not a final and appealable order). Indeed, Smith's circumstances and relationships may change before he is eligible to be released on supervised release. Therefore, Smith's request to transfer supervised release jurisdiction is denied as premature.

III.   Conclusion

Consistent with the foregoing analysis, Smith's Motion to Transfer Supervised Release Jurisdiction (#409) is denied as premature and his Letter Motion (#429) is denied.

SIGNED at Beaumont, Texas, this 28th day of June, 2020.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE